Hal HAVILAND, Appellant,

v.

Earl L. BUTZ, Secretary of Agriculture.

No. 74–1322.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1975.

Decided March 23, 1976.

Before LEVENTHAL and ROBINSON, Circuit Judges, and JACK R. MILLER,* Judge, United States Court of Customs and Patent Appeals.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Hal Haviland owns and operates a professional animal act in which dogs and ponies are featured.[1] The act is presented to paying audiences in a number of states[2] and has occasionally appeared on commercial television.[3] In the view that Haviland was an "exhibitor" as defined by the Animal Welfare Act of 1970,[4] the Department of Agriculture gave notice that he was in violation of its licensing provisions[5] and that proceedings might be instituted to compel compliance.[6]

To avoid the risk of possible penalties,[7] Haviland obtained an exhibitor's license.[8] He then brought suit in the District Court against the Secretary of Agriculture for a judgment declaring that he was not subject to regulation under the Act.[9] The court granted summary judg-

Carl L. Shipley, Washington, D. C., for appellant.

Justin D. Simon, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Thomas G. Corcoran, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. While the record is silent as to the exact number of animals thus engaged, Haviland tells us that "[h]e uses one or two ponies and four or five dogs." Brief for Appellant at 5.

2. Between August 1, 1972, and August 16, 1973, Haviland gave performances in 13 states on approximately 73 separate dates.

3. During the period mentioned, note 2 *supra*, the act performed on commercial television in Chicago and the District of Columbia on three separate occasions.

4. Pub.L.No.91–579, 84 Stat. 1560 (1970), 7 U.S.C. §§ 2131 *et seq.* (1970). See also text *infra* at note 18.

5. Animal Welfare Act of 1970, § 7, 7 U.S.C. § 2136 (1970). See also text *infra* at note 17.

6. See Animal Welfare Act of 1970, § 17(c), 7 U.S.C. § 2146(c) (1970). See also note 8 *infra*.

7. See Animal Welfare Act of 1970, §§ 20(a), (c), 7 U.S.C. §§ 2149(a), (c) (1970).

8. The Secretary of Agriculture apparently has not, however, seen fit to establish any procedure by which Haviland could have contested administratively the applicability of the Act to his operation. Although the regulations delineate procedures for adjudication of charges of violations by licensees, see 9 C.F.R. §§ 4.1 *et seq.* (1975), those procedures do not apply to failures to obtain licenses. See 9 C.F.R. § 4.3 (1975).

9. We think the District Court had power to deal with Haviland's lawsuit. Section 17(c) of the Act, 7 U.S.C. § 2146(c) (1970), confers jurisdiction on the federal district courts "in all . . . kinds of cases arising under" the Act except as provided in §§ 17(b) and 21(b), 7 U.S.C. §§ 2146(b), 2150(b) (1970). Section 17(b) channels review of final cease and desist orders to the courts of appeals, and specifically provides that "[j]udicial review of any such order shall be upon the record upon which the final determination and order of the Secretary were based." Haviland was not seeking review of any cease and desist order, for there had been none, nor was there any administrative record upon which the Department's notice could have been based. See note 8 *supra*. Section 21(b), providing also for review in the

ment in favor of the Secretary [10] and Haviland now appeals.

Reversal is urged on several grounds. Haviland asserts that the Act, properly construed, does not extend to his dog and pony show, and that inclusion of animal acts in the Secretary's implementing regulations is an unconstitutional usurpation of legislative power.[11] He further contends that the Act exceeds congressional power under the Commerce Clause [12] and discriminates invidiously in contravention of the Fifth Amendment's Due Process Clause.[13] We affirm.

## I

In 1966, Congress enacted the Federal Laboratory Animal Welfare Act [14] "to deal with the abuses that have developed as a result of the Nation's vast program of medical research," [15] particularly research involving experimentation with animals.[16] The Animal Welfare Act of 1970 expanded the coverage of the 1966 statute to enlarge the class of protected animals and to regulate their use for exhibition purposes or as pets as well as their use for research purposes.[17]

courts of appeals, applies only to the Secretary's final orders affecting research facilities. It is thus clear that neither of the two exceptions from district court jurisdiction has any role in the case at bar. And plainly the dispute regarding licensing was one "arising under" the Act. *Oneida Indian Nation v. Oneida County,* 414 U.S. 661, 676–682, 94 S.Ct. 772, 781–784, 39 L.Ed.2d 73, 84–87 (1974); *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912, 917–918 (1951); *Binderup v. Pathé Exchange,* 263 U.S. 291, 305–312, 44 S.Ct. 96, 98–101, 68 L.Ed. 308, 314–318 (1923); *Hopkins v. Walker,* 244 U.S. 486, 489–491, 37 S.Ct. 711, 712–714, 61 L.Ed. 1270, 1274–1275 (1917); *Pacific Elec. R. R. v. Los Angeles,* 194 U.S. 112, 117–118, 24 S.Ct. 586, 588–589, 48 L.Ed. 896, 899 (1904); *Walla Walla v. Walla Walla Water Co.,* 172 U.S. 1, 11, 19 S.Ct. 77, 81–82, 43 L.Ed. 341, 346 (1898).

Although there has been no "formal" agency action, see note 8 *supra,* we see no difficulty in subjecting the Secretary's activity to judicial review at this point. See *Independent Broker-Dealers' Trade Ass'n v. SEC,* 142 U.S.App.D.C. 384, 391–393, 442 F.2d 132, 139–141, *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971); *Medical Comm. for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 235–240, 432 F.2d 659, 668–673 (1970), *vacated on other grounds,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). And notwithstanding claims by Haviland that the Act is unconstitutional, a three-judge court was not required since his complaint did not request injunctive relief, but only a declaratory judgment. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 153–155, 83 S.Ct. 554, 559–561, 9 L.Ed.2d 644, 652–653 (1963); *Sellers v. Regents of Univ. of California,* 432 F.2d 493, 498 (9th Cir. 1970), *cert. denied,* 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971).

10. *Haviland v. Butz,* Civ. No. 474–73 (Dec. 13, 1973) (unreported).

11. Discussed in Part I *infra.*

12. Discussed in Part II *infra.*

13. Discussed in Part II *infra.*

14. Pub.L.No.89–544, 80 Stat. 350 (1966).

15. S.Rep.No.1281, 89th Cong., 2d Sess. 5 (1966), U.S.Code Cong. & Admin.News 1966, p. 2636.

16. *Id.*

17. See H.R.Rep.No.1651, 91st Cong., 2d Sess. 9 (1970), U.S.Code Cong. & Admin.News 1970, p. 5103. The occasion for the legislation is described as follows:

> In order to protect the owners of animals, from the theft of their animals, to prevent the sale or use of animals which have been stolen, and to insure that certain animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment, it is essential to regulate the transportation, purchase, sale, housing, care, handling, and treatment of such animals by persons or organizations engaged in using them for research or experimental purposes or for exhibition purposes or holding them for sale as pets or in transporting, buying, or selling them for any such purpose or use.

Animal Welfare Act of 1970, § 2, 7 U.S.C. § 2131 (1970). The Act establishes humane standards, §§ 13, 14, 15, 7 U.S.C. §§ 2142, 2143, 2144 (1970), and requirements for licenses, registration and recordkeeping, §§ 4, 5, 7, 11, 13, 7 U.S.C. §§ 2133, 2134, 2136, 2140, 2142 (1970), and provides for inspections, §§ 17(a), 18, 7 U.S.C. §§ 2146(a), 2147 (1970).

The Secretary claims that Haviland is subject to the Animal Welfare Act as an "exhibitor," defined by the Act as

any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary, and such term includes carnivals, circuses and zoos exhibiting such animals whether operated for profit or not; but such term excludes retail pet stores, organizations sponsoring and all persons participating in State and country [sic] fairs, livestock shows, rodeos, purebred dog and cat shows, and any other fairs or exhibitions intended to advance agricultural arts and sciences, as may be determined by the Secretary.[18] The Secretary's regulations augment the statutory definition by inserting the words "animal acts" between "circuses" and "zoos." [19]

■■■ Haviland contends that this addition is unauthorized—that the Act, as written and intended, does not embrace animal performances—and that the Secretary could not expand its coverage.[20] We think, however, that exhibitions utilizing animals to which the Act extends its protections [21] were fairly comprehended among its objects.[22] The Act itself declares that one of

18. Animal Welfare Act of 1970, § 3(h), 7 U.S.C. § 2132(h) (1970).

19. 9 C.F.R. § 1.1(v) (1975). The Secretary also corrected a rather obvious printing error, changing "country" to "county." *Id.*

20. The argument is cast in constitutional form—that Congress did not cover animal acts in the Animal Welfare Act of 1970, and the Secretary cannot do so because only Congress is constitutionally authorized to exercise the federal legislative power. U.S.Const. art. 1, § 1; see also *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 587–589, 72 S.Ct. 863, 866–867, 96 L.Ed. 1153, 1167–1168 (1952). Since it cannot be maintained that the Secretary may enact legislation, the question becomes simply whether the Secretary had authority to specifically designate animal acts as activities embraced within the legislation.

21. See note 23 *infra.*

22. We are mindful that one otherwise an "exhibitor" is not subject to the Act unless his exhibition includes an animal "purchased in commerce or the intended distribution of which affects commerce, or will affect commerce." Animal Welfare Act of 1970, § 3(h), 7 U.S.C. § 2132(h) (1970). While it appears that in 1971 Haviland bought two dogs in Michigan and in 1973 was given two dogs in Ohio, we would agree that this information is too skimpy to eliminate a dispute, generated by the pleadings, as to whether Haviland exhibits a protected *animal* "purchased in commerce." Particularly in view of Haviland's extensive travels, acquisition of these animals may have occurred under circumstances such that they were not "purchased in commerce" within the contemplation of the Act.

We are, however, satisfied that Haviland's animal show is intercepted because it features dogs "the intended distribution of which affects commerce." Despite some ambiguity arising from selection of the word "distribution," other factors persuade us to the conclusion that its intended import is synonymous with "transportation." In the first place, a commonly accepted meaning of "distribution" is "a spreading out or scattering over an area or throughout a space." *Merriam-Webster New International Dictionary* 660 (3d ed. 1964). Thus "distribution" is somewhat broader than "transportation" in the sense that the movement effecting the spreading out need not be recurrent. More importantly, the Act expressly declares at the outset that "[i]n order . . . to insure that [protected] animals intended for use . . . for exhibition purposes . . . are provided humane care and treatment, it is essential to regulate the *transportation* . . . of such animals by persons and organizations engaged in using them for . . . exhibition purposes or . . . in *transporting* . . . them for any such purpose or use." Animal Welfare Act of 1970, § 2, 7 U.S.C. § 2131 (1970), quoted in full *supra* note 17 (emphasis supplied). Indeed, it would strike us as highly anomalous that an animal-act producer would be regulated if he bought but one animal in interstate commerce, but otherwise would not be regulated although his entire animal troupe was continually on an interstate circuit. We similarly have difficulty in believing that Congress meant to condition amenability to the Act as an "exhibitor" simply on an intention to eventually dispose of an animal in interstate commerce, perhaps years later after its days as a performer came to an end. We cannot imagine what sort of interstate "distribution" Congress envisioned in the case of an animal exhibitor unless it is the distribution inherent in widespread state-to-state renditions.

Without a doubt, Haviland's activities as such an exhibitor fully meet the "distribution" test as thus interpreted. His dog and pony show travels constantly through a number of

its goals is "to insure that certain animals intended for use . . . for exhibition purposes . . . are provided humane care and treatment. . . ." [23] The statutory specification is that "[t]he term 'exhibitor' . . . includes carnivals, circuses, and zoos exhibiting such animals," [24] and not that other essentially similar enterprises are excluded. In like vein, the accompanying report of the House Committee on Agriculture [25] states that a prime objective was to "bring into the regulatory framework of the Act for the first time exhibitors (*such as* circuses, zoos, carnivals and road shows) . . . ." [26] The words "includes" and "such as" point convincingly to the conclusion that the listing of types of exhibitions in the statutory text was intended to be but partial and illustrative.

■ Moreover, courts are duty bound to follow "the construction of a statute by those charged with its execution . . . unless there are compelling indications that it is wrong." [27] This "deference . . .

is heightened when," as here, "the case involves the construction of a new statute by its implementing agency." [28] We see nothing suggesting persuasively that the Secretary's interpretation of "exhibitor" is incorrect. Certainly we discern no difference between animal acts on the one hand and circuses and carnivals on the other that is significant enough to warrant an upset of the Secretary's construction as a departure from the intent of Congress.[29]

■ We are thus constrained to reject Haviland's contention that the statutory listing of covered enterprises is exhaustive, and to sustain the Secretary's interpretative regulation. The Secretary is empowered "to promulgate such rules, regulations, and orders as he may deem necessary in order to effect the purposes of" the statutory scheme.[30] It has long been recognized that delegations of this kind are necessary to enable Congress to exert its legislative powers effectively.[31] We find nothing in this delegation to justify the extraordinary step

states. See notes 2–3 *supra.* Transportation of his complement of animal actors for their far flung schedule of appearances "affects commerce." That term "means in commerce, . . ." *id.* § 3(d), 7 U.S.C. § 2132(d) (1970), and the commerce spoken of is interstate commerce. *Id.* § 3(c), 7 U.S.C. § 2132(c) (1970).

23. Animal Welfare Act of 1970, § 2, 7 U.S.C. § 2131 (1970), quoted *supra* note 17. The Act defines "animals," in relevant part, as including "any live . . . dog . . ., or such other *warmblooded animal, as the Secretary may de*termine is being used, . . . for . . . exhibition purposes . . . ." Animal Welfare Act of 1970, § 3(g), 7 U.S.C. § 2132(g) (1970). Since Haviland employs dogs in his act, we need not consider whether the ponies used therein fall within § 3(g)'s exception for "horses not used for research purposes."

24. Animal Welfare Act of 1970, § 3(h), 7 U.S.C. § 2132(h) (1970) (emphasis supplied).

25. No Senate Report accompanied the legislation.

26. H.R.Rep.No.1651, 91st Cong., 2d Sess. 2 (1970), U.S.Code Cong. & Admin.News 1970, p. 5104 (emphasis supplied).

27. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–1802, 23 L.Ed.2d 371, 383–384 (1969). See also *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–802,

13 L.Ed.2d 616, 625–627 (1965); *United Shoe Workers v. Bedell,* 165 U.S.App.D.C. 113, 124, 506 F.2d 174, 185 (1974).

28. *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 326, 510 F.2d 692, 706 (1975). See also *Power Reactor Dev. Corp. v. Electrical Workers Int'l,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924, 932 (1961).

29. Haviland argues that since the Secretary thought it necessary to add "animal acts" to the definition of "exhibitor," he did not regard "animal acts" as synonymous with any of the descriptive words appearing in the statute. We cannot accept the premise of this argument. It seems far more likely that the Secretary was endeavoring to give notice that animal acts would be deemed within the statutory definition, thereby, to the extent possible, keeping operators of animal acts from being taken by surprise.

30. Animal Welfare Act of 1970, § 21, 7 U.S.C. § 2151 (1970).

31. *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263, 1273–1274 (1940); *Currin v. Wallace,* 306 U.S. 1, 15, 59 S.Ct. 379, 386–387, 83 L.Ed. 441, 451 (1939); *Panama Ref. Co. v. Ryan,* 293 U.S. 388, 421, 55 S.Ct. 241, 248–249, 79 L.Ed. 446, 459 (1935).

of declaring it void.[32] We hold that Haviland is within the regulatory compass of the Act.

## II

We now address Haviland's constitutional contentions, first his argument that multistate presentations of his dog and pony show are not activity affecting interstate commerce, and for that reason are beyond the legislative authority conferred by the Commerce Clause.[33] Characterizing his animal performances as local exhibitions analogous to baseball games, Haviland relies primarily on three Supreme Court decisions [34] for the proposition that his productions, like professional baseball contests, are not appropriate subjects for federal regulation. This position does not withstand analysis of the precedents cited, nor does Haviland's claim of immunity for his own operation survive the impact of relevant decisions during the past generation.[35]

In 1922, the Supreme Court held in *Federal Baseball Club v. National League* [36] that the business of staging baseball games, though in a multistate circuit, is not interstate commerce.[37] This view was adhered to in 1953 in *Toolson v. New York Yankees,*

*Inc.,*[38] "[w]ithout reexamination of the underlying issues." [39] In *Flood v. Kuhn,*[40] decided in 1972, however, the Court denominated the rule of *Federal Baseball* and *Toolson* "an aberration confined to baseball." [41] Despite the local quality of individual ·contests, professional baseball, the Court said, was indeed an interstate enterprise; [42] only on grounds of stare decisis was there justification for the gross inconsistency of *Federal Baseball* and *Toolson* with orthodox doctrine defining the commerce power.[43] Even more significantly, the Court stated specifically that virtually all other professional sports are to be treated as operations in interstate commerce and amenable to federal legislation.[44]

Our mandate is thus clear—the principle enunciated in *Federal Baseball* and *Toolson* is not to be extended to other businesses. Moreover, that is the clear course of judicial decision.[45] We hold that Haviland's animal act, traveling from state to state to render performances and sometimes even utilizing the facilities of interstate communication to reach its audiences,[46] is subject to regulation by Congress in the exercise of the commerce power.[47]

32. Compare cases cited *supra* note 31.

33. U.S.Const. art. 1, § 8, cl. 3.

34. *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); *Federal Baseball Club v. National League,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

35. See cases cited *infra* notes 45, 47.

36. *Supra* note 34.

37. 259 U.S. at 209, 42 S.Ct. at 466, 66 L.Ed. at 900.

38. *Supra* note 34.

39. 346 U.S. at 357, 74 S.Ct. at 79, 98 L.Ed. at 68.

40. *Supra* note 34.

41. 407 U.S. at 282, 92 S.Ct. at 2112, 32 L.Ed.2d at 743.

42. *Id.*

43. *Id.* at 282–283, 92 S.Ct. at 2112, 32 L.Ed.2d at 744.

44. *Id.*

45. *Radovich v. National Football League,* 352 U.S. 445, 450–452, 77 S.Ct. 390, 393–394, 1 L.Ed.2d 456, 460–462 (1957); *United States v. International Boxing Club,* 348 U.S. 236, 243, 75 S.Ct. 259, 262, 99 L.Ed. 290, 296 (1955); *United States v. Shubert,* 348 U.S. 222, 228–230, 75 S.Ct. 277, 281–282, 99 L.Ed. 279, 285–287 (1955). See also *Haywood v. National Basketball Ass'n,* 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Douglas, J., as Circuit Justice).

46. See notes 2–3 *supra.*

47. Compare *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 194–195, 6 L.Ed. 23 (1822).

Lastly, Haviland argues that the classification effected by the Act's definition of "exhibitor"[48] infringes the equal protection guaranty of the Fifth Amendment's Due Process Clause.[49] The term is to include "carnivals, circuses, and zoos"— and, as we have held, animal acts—but is to exclude "retail pet stores, organizations sponsoring and all persons participating in State and country fairs, livestock shows, rodeos, purebred dog and cat shows, and any other fairs or exhibitions intended to advance agricultural arts and sciences, as may be determined by the Secretary."[50] But notwithstanding the number and breadth of the exclusions, the "legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest."[51] We believe that clearly it is.

Among the expressly articulated purposes of the Act, we repeat, is assurance that designated species of animals used in the types of exhibitions covered will receive humane care and treatment.[52] The coverage clause of the definition of "exhibitor"

directly implements this legislative objective. Haviland wisely does not contest the propriety of the definition overall; rather, he asserts that there is no rational basis for distinguishing some other kinds of exhibitions, particularly rodeos.[53]

In essence, Haviland's thesis is that Congress recognized a problem of inhumanity to animals but attacked only a part of it. He insists that the requirements imposed by the Act upon producers of animal acts and other performances, but not upon operators of rodeos and other enterprises, is unjustly discriminatory. We note initially that the fact "[t]hat a statute treats different persons contrastingly does not, without more, signify that equal protection is wanting,"[54] and that neither "is the showing made by the additional circumstance that in actuality the law does not apply to all to whom it conceivably could."[55] And we give heed to the Supreme Court's teaching that "[a] statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it

**48.** See text *supra* at note 18.

**49.** The "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514, 519 n. 2 (1975). See also *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782, 787 (1973); *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218, 222 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**50.** See text *supra* at note 18.

**51.** *United States Dep't of Agriculture v. Moreno, supra* note 49, 413 U.S. at 533, 93 S.Ct. at 2825, 37 L.Ed.2d at 787. See also *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

**52.** See note 17 *supra.*

**53.** The bill originally introduced in the House defined "exhibitor" as "any person (public or private) exhibiting animals to the public free or for compensation, including but not limited to zoos and circuses." *Hearings on H.R. 13857 Before the Sub-Comm. on Livestock and Grains*

*of the House Comm. on Agriculture* 103 (1970). The exclusion of rodeos first appeared in the bill reported to the House, H.R.Rep.No.1651, 91st Cong., 2d Sess. 10 (1970), despite evidence that animals were abused in rodeos. *Hearings on H.R. 13957, supra,* at 68–71, 96. Although this change is not explained in the reports or debates, possible reasons do appear. For example, some members of Congress expressed concern about the cost of administering the Act. See, *e. g.,* 116 Cong.Rec. 40155 (1970); *Hearings on H.R. 13957, supra,* at 44, 54–55. The practicality of applying the Act to all retail pet stores was doubted, *Hearings on H.R. 13957, supra* at 67, and these stores were ultimately excluded. See text *supra* at note 18.

**54.** *Washington v. United States,* 130 U.S.App. D.C. 374, 382, 401 F.2d 915, 923 (1968). See also *Griffin v. County School Bd.,* 377 U.S. 218, 230, 84 S.Ct. 1226, 1232–1233, 12 L.Ed.2d 256, 264–265 (1964).

**55.** *Washington v. United States, supra* note 54, 130 U.S.App.D.C. at 382, 401 F.2d at 923. See also *United States v. Petrillo,* 332 U.S. 1, 8–9, 67 S.Ct. 1538, 1542–1543, 91 L.Ed. 1877, 1883–1884 (1947); *Whitney v. California,* 274 U.S. 357, 370, 47 S.Ct. 641, 646, 71 L.Ed. 1095, 1103–1104 (1927).

tends to produce." [56]   For "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies"; [57] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." [58] "The legislature" thus, the Court informs, "may select one phase of one field and apply a remedy there, neglecting the others"; [59] in sum, the constitutional call for equality of treatment "does not require [a choice] between attacking every aspect of a problem or not attacking the problem at all." [60]

Haviland's equal protection contention flies in the face of these established principles.   It is constitutionally unimportant that Congress has not seen fit to regulate all interstate transportation, purchasing or selling of animals in one fell swoop.   As the evolution of the Animal Welfare Act manifests,[61] Congress has chosen a cautious approach to regulation in this area, increasing governmental intervention as the national interest seemed to warrant.   As the House Committee on Agriculture put it, the Animal Welfare Act "represents a continuing commitment by Congress to the ethic of kindness to dumb animals." [62]   From the small beginning in 1966—confined to a few animals, and only when they were devoted to research purposes—the present legislation further, though still modestly, "implement[s] a statutory mandate that small helpless creatures deserve the care and protection of a strong and enlightened public." [63]   We perceive nothing in the Constitution outlawing this commendable "effort to demonstrate America's humanity to lesser creatures." [64]

The judgment appealed from is

*Affirmed.*

**56.** *Goesaert v. Cleary,* 335 U.S. 464, 467, 69 S.Ct. 198, 200, 93 L.Ed. 163, 166 (1948), quoting *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722, 728–729 (1929).

**57.** *Two Guys from Harrison-Allentown, Inc. v. McGinley,* 366 U.S. 582, 591–592, 81 S.Ct. 1135, 1140, 6 L.Ed.2d 551, 558 (1961), quoting *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955).

**58.** *Williamson v. Lee Optical Co., supra* note 57, 348 U.S. at 489, 75 S.Ct. at 465, 99 L.Ed. at 573.

**59.** *Id.*   See also *Geduldig v. Aiello,* 417 U.S. 484, 494–495, 94 S.Ct. 2485, 2491–2492, 41 L.Ed.2d 256, 263–264 (1974); *Two Guys from Harrison-Allentown, Inc. v. McGinley, supra* note 57, 366 U.S. at 591–592, 81 S.Ct. at 1140, 6 L.Ed.2d at 558.   *Cf. South Carolina v. Katzenbach,* 383 U.S. 301, 330–331, 86 S.Ct. 803, 819–820, 15 L.Ed.2d 769, 787–788 (1966).

**60.** *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491, 503 (1970).   See also *Geduldig v. Aiello, supra* note 59, 417 U.S. at 494–495, 94 S.Ct. at 2491–2492, 41 L.Ed.2d at 263–264; *Morton v. Ruiz,* 415 U.S. 199, 230–231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270, 291–292 (1974).   And see *Lindsley v. Nat-*

*ural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

**61.** See text *supra* at notes 14–17.

**62.** H.R.Rep.No.91–1651, 91st Cong., 2d Sess. 1 (1970), U.S.Code Cong. & Admin.News 1970, p. 5104.

**63.** *Id.*

**64.** *Id.*   Beyond that, animal acts bear a likeness to carnivals and circuses that sharply diminishes when the comparison is with rodeos and other excluded enterprises.   Carnivals and circuses travel about as does Haviland's animal act, and share the problems of traveling animals.   Many circuses and some carnivals have dog and pony shows.   Carnivals, circuses and animal acts have a measure of sameness in their performances and use of animals.   Rodeos do not possess nearly the same degree of similarity to animal acts, and other excluded activities have even less or none at all.   Certainly the resemblances between animal acts and rodeos are not so marked as to preclude differences in legislative treatment.   See cases cited *supra* notes 51, 54–60.