[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14217
_____

D. C. Docket No. 4:09-cv-10050-JEM

907 WHITEHEAD STREET, INC.,
d.b.a. Ernest Hemingway Home and Museum,

Plaintiff-Appellant,

versus

SECRETARY OF THE U.S. DEPARTMENT OF AGRICULTURE,
DR. CHESTER A. GIPSON,
Deputy Administrator of Animal Care for the Animal and Plant
Health Inspection Services, United States Department of Agriculture,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(December 7, 2012)

Before DUBINA, Chief Judge, PRYOR and HILL, Circuit Judges.

DUBINA, Chief Judge:

Appellant 907 Whitehead Street, Inc., d/b/a Ernest Hemingway Home and Museum ("the Museum"), appeals the district court's post-trial order denying the Museum declaratory and injunctive relief. The Museum challenges the jurisdiction of the U.S. Department of Agriculture and its Animal and Plant Health Inspection Service (collectively the "USDA") to regulate the Museum as an animal exhibitor under the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 et seq. The district court concluded that the Museum is indeed subject to the USDA's regulatory reach pursuant to the AWA. After considering the parties' arguments and having the benefit of oral argument, we agree with the district court's findings of fact and conclusions of law and hold that the Museum is an AWA animal exhibitor subject to USDA regulation.

I.

Ernest Hemingway lived at 907 Whitehead Street in Key West, Florida, from 1931 to 1938. During that time, Hemingway's friend, Captain Stanley Dexter, gave Hemingway a polydactyl cat named Snowball.[1] Since Hemingway's time at 907 Whitehead Street, Snowball's polydactyl progeny (the "Hemingway cats") have thrived and populated the property. In 1961, Bernice Dixon ("Dixon") purchased 907 Whitehead Street from Hemingway's estate. The Hemingway cats

---

[1] A polydactyl cat has more than the normal number of digits on one or more of its paws.

2

are not mentioned in Dixon's purchase and sale agreement; the cats were simply present at 907 Whitehead Street when she took possession. Dixon opened the property for tours in 1964. When Dixon died, her sisters inherited the house, maintained it as a museum, and incorporated it in 1994 as 907 Whitehead Street, Inc. Dixon's great-nephew, Michael A. Morawski ("Morawski"), is the corporation's current CEO.

The Museum has always kept, fed, and provided weekly veterinary care for the Hemingway cats. The cats live and roam freely on the grounds that are enclosed by a brick fence at the property's perimeter. To prevent population beyond the historical norm of 50–60 cats, the majority of the cats are spayed or neutered so that only a couple of cats of each sex are reproductive. At the time of the district court's bench trial, the Museum had 44 Hemingway cats.

No Hemingway cat has ever been bought or sold, although some cats have been given away at various times.[2] However, the Museum charges admission for a tour of the property, and the tour includes seeing and discussing the roaming Hemingway cats. Approximately 250,000 visitors from within and beyond Florida visit the Museum annually. The Museum's gift shop sells cat-related merchandise online and at its physical location. The Museum's website offers a secondary page

---

[2] Dixon gave away Hemingway cats; Morawski gave away non-Hemingway kittens which were left in the Museum's care.

devoted exclusively to the Hemingway cats as well as another secondary page including a web camera focusing on the cats. The Museum produced a video featuring the Hemingway cats that has been promoted through "Visit Florida," a tourism organization with its own website. The Hemingway cats are also featured prominently in print advertisements.

At some point several years ago, a Museum visitor complained to the USDA about the Museum's care of the cats.[3] USDA inspectors responded by visiting and corresponding with the Museum. In October 2003, Dr. Elizabeth Goldentyer, a USDA regional director for animal care, determined that the Museum was an animal exhibitor subject to USDA regulation under the AWA because (1) the Museum exhibited the cats for the cost of an admission fee, and (2) the cats were used in promotional advertising. Two USDA policy manuals supporting Goldentyer's conclusion, *Animal Care Resource Inspector Guide* and *Licensing and Registration Under the Animal Welfare Act*, define exhibited animals as animals that are displayed for some form of compensation.

From the outset of the USDA's intervention, the Museum has resisted the federal government's attempts to interfere with the Museum's care for the Hemingway cats. The Museum protests the USDA officials' alleged demands that

---

[3] This fact is not in the record, but when asserted by the USDA at oral argument, the Museum did not contest it.

the Museum: obtain an exhibitor's license; contain and cage the cats in individual shelters at night, or alternatively, construct a higher fence or an electric wire atop the existing brick wall, or alternatively, hire a night watchman to monitor the cats; tag each cat for identification purposes; construct additional elevated resting surfaces for the cats within their existing enclosures; and pay fines for the Museum's non-compliance with the AWA.  At one point, the USDA allegedly refused to issue an exhibitor's license to the Museum and threatened to confiscate the cats from the property.  Then, during an agency-initiated administrative proceeding against the Museum, Dr. Chester A. Gipson ("Dr. Gipson"), a USDA deputy administrator for animal care, proposed a temporary resolution: granting the Museum an exhibitor's license from the USDA without prejudicing the Museum's right to contest the USDA's legal authority to regulate the Museum. Consequently, the Museum has been licensed as an exhibitor since August 2008.

The Museum filed the instant complaint in October 2009 against the Secretary of Agriculture and Dr. Gipson, requesting a declaratory judgment that: (1) the Museum is not an "exhibitor" under the AWA and is not under the USDA's animal care jurisdiction; (2) the Hemingway cats do not have an effect on interstate commerce sufficient to subject the Museum to AWA regulation; (3) Congress passed the AWA only to protect animals physically moving in interstate

5

commerce; and (4) the AWA does not authorize federal regulation of a field already occupied by local and state animal welfare laws.  After a bench trial, the district court rendered its findings of facts and conclusions of law in favor of the Secretary and Dr. Gipson.  The Museum appealed.  We affirm.

## II.

Following a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*.  *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008).  We also review *de novo* the interpretation and application of a statute.  *Dawson v. Scott*, 50 F.3d 884, 886 (11th Cir. 1995).  When a statute is silent or ambiguous, we afford deference to an administrative agency's interpretation of the statute as long as it is reasonable and not "arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 886–87 (internal quotation marks omitted).

## III.

The Museum argues that it is not an "exhibitor" of animals as defined in the AWA and, even if it is, the AWA is unconstitutional as applied to the Museum and its Hemingway cats.  Consistent with the principle that "a federal court should refuse to decide a constitutional issue unless a constitutional decision is strictly

6

necessary," *Cone Corp. v. Fla. Dep't. of Transp.*, 921 F.2d 1190, 1210 (11th Cir. 1991), we begin with the question of statutory interpretation.

The AWA somewhat obscurely defines an "exhibitor" as "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation, as determined by the Secretary."  7 U.S.C. § 2132(h). The Museum does not dispute that it exhibits the Hemingway cats to the public for compensation, so the crux of this case appears to be whether the Museum's exhibition of cats is a "*distribution* . . . which affects [interstate] commerce." *See id.* (emphasis added).

Because most animal-related exhibitions contain animals that have been purchased and transported in commerce, very few courts have been presented with an occasion to interpret the AWA's use of the term "distribution."  The Museum points out dicta in *Haviland v. Butz* where the D.C. Circuit stated that the term "distribution" is synonymous with "transportation."  543 F.2d 169, 173 n.22 (D.C. Cir. 1976) (upholding applicability of the AWA to a traveling, interstate dog-and-pony show).  Of course, this comment is advantageous to the Museum because the Hemingway cats have never been transported anywhere.

7

But in its administrative agency decisions, the Secretary of Agriculture has interpreted "distribution" more liberally and applied it to intrastate, "fixed-site exhibitions." *In re Lloyd A. Good, Jr.*, 49 Agric. Dec. 156, 174 (1990) (holding that a stationary dolphin exhibition was subject to the AWA). In *Good*, the Secretary reasoned that the word "distribution" relates only to "the manner in which the animals are displayed to the public," and thus, an exhibitor becomes subject to the AWA if he "distributes" animals "by television *or simply by making them available to the public*." *Id.* (emphasis added). The Secretary supported this interpretation by reasoning that the word "distribution" can mean "an array of objects or events in space or time" or "any spatial or temporal array of objects or events." *Id.* at 173 (citing WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 391 (1984) and THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 384–85 (New College Edition, 1976), respectively). Therefore, a repeated and regular exhibition fits the cited dictionary definitions of "distribution." *Id*. at 173–74. The Secretary further reasoned that one of Congress's "basic purposes" for expanding the scope of the AWA in 1976 was to "bring into the regulatory framework of the Act for the first time exhibitors (such as circuses, *zoos*, carnivals[,] and road shows)." *Id.* at 174 (quoting H.R. REP. NO. 1651, at 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5104) (emphasis added). Upon consideration of

8

this legislative history, the Secretary aptly noted that "[z]oos do not move from place to place." *Good*, 49 Agric. Dec. at 174. Accordingly, the Secretary found that a person acts as an exhibitor as defined by Congress "simply by making animals available to the public." *Id.* For over two decades, the USDA has relied upon this interpretation to apply the AWA to fixed-site, intra-state exhibitors like the Museum. *See, e.g.*, *In re Peter Gronbeck*, AWA Docket No. 05-0018, 2007 WL 3170301, at *1 n.2 (U.S.D.A. Feb. 27, 2007); *In re Ronnie Faircloth*, 52 Agric. Dec. 171, 174–75 (U.S.D.A. 1993).

The Secretary's reasonable and consistent interpretation of "exhibitor" as articulated in *Good* is entitled to *Chevron* deference. *See Dawson*, 50 F.3d at 886–87. Pursuant to *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), a court must first "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S. Ct. at 2781. But when "the statute is silent or ambiguous with respect to the specific issue," and an administrating agency has interpreted the statute, courts are bound to show deference to the agency's reasonable interpretation, so long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S. Ct. at 2782. The statute is ambiguous on the question whether "distribution" includes the display of animals by a fixed-site commercial enterprise. And, given Congress's

9

intent to regulate zoos, 7 U.S.C. § 2132(h), which are notably stationary and which could potentially exhibit animals that are neither purchased nor transported in commerce, we cannot see how the Secretary's interpretation of "exhibitor" is unreasonable. The Museum makes no attempt to explain why that interpretation is not entitled to *Chevron* deference.

Based on this reasonable interpretation to which we accord deference, the district court correctly found that the Museum qualifies as an animal exhibitor under the AWA. Without explicitly acknowledging the most obvious means of exhibiting the Hemingway cats (i.e., displaying them to the public for compensation), the district court found that the animals were "distributed" in these two ways: (1) when Dixon, and later, Morawski, gave cats away, and (2) when the Museum broadcasted images of the Hemingway cats online and used them to attract visitors through promotional advertising materials. [*See* R. 74 at 10–11, ¶¶ 39, 42.] Perhaps because of the district court's conclusions on the promotional advertising, the Museum focuses all of its energy in this appeal toward convincing us that the application of the AWA cannot be based merely upon the Museum's use of the cats' images in promotional media. The Museum posits that, without any "distribution" via promotional photographic or video advertising featuring the Hemingway cats, the Museum would no longer be subject to the AWA. The

10

Museum's arguments are mistaken.  The Museum "distributes" the cats in a manner affecting commerce every time it exhibits them to the public for compensation.  *See Good*, 49 Agric. Dec. at 174.  Thus, we hold that the Museum is subject to the AWA because the Museum's use of the Hemingway cats falls within the reasonable interpretation of the AWA by the USDA.

We must now address whether the regulation of the Museum and its Hemingway cats exceeds Congress's authority under its power "[t]o regulate Commerce . . . among the several States."  U.S. CONST. art. I, § 8, cl. 3.  The Commerce Clause authorizes Congress to regulate "the channels of interstate commerce, persons or things in interstate commerce, and those activities that substantially affect interstate commerce."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, ___ U.S. ____, 132 S. Ct. 2566, 2578 (2012) (internal quotation marks omitted) (quoting *United States v. Morrison*, 529 U.S. 598, 609, 120 S. Ct. 1740, 1749 (2000)).  This case involves only the final object of Congress's commerce jurisdiction because the Hemingway cats themselves are neither channels of interstate commerce nor things in interstate commerce.

We conclude that the Museum's exhibition of the cats substantially affects interstate commerce.  The Museum argues that its activities are of a purely local nature because the Hemingway cats spend their entire lives at the Museum—the

11

cats are never purchased, never sold, and never travel beyond 907 Whitehead Street.  *See* Reply Br. at 3 (citing *United States v. Lopez*, 514 U.S. 549, 567–68, 115 S. Ct. 1624, 1634 (1995)).  But the local character of an activity does not necessarily exempt it from federal regulation.  "[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence."  *Gonzales v. Raich*, 545 U.S. 1, 17, 125 S. Ct. 2195, 2206 (2005) (internal quotation marks omitted); *see also Wickard v. Filburn*, 317 U.S. 111, 125, 63 S. Ct. 82, 89 (1942) (reasoning that even if "activity be local[,] and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce").  And it is well-settled that, when local businesses solicit out-of-state tourists, they engage in activity affecting interstate commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573, 117 S. Ct. 1590, 1596–97 (1997).  The Museum invites and receives thousands of admission-paying visitors from beyond Florida, many of whom are drawn by the Museum's reputation for and purposeful marketing of the Hemingway cats.  The exhibition of the Hemingway cats is integral to the Museum's commercial purpose, and thus, their exhibition affects interstate

12

commerce.  For these reasons, Congress has the power to regulate the Museum and the exhibition of the Hemingway cats via the AWA.

IV.

Notwithstanding our holding, we appreciate the Museum's somewhat unique situation, and we sympathize with its frustration.  Nevertheless, it is not the court's role to evaluate the wisdom of federal regulations implemented according to the powers constitutionally vested in Congress.  *See Sebelius*, ___ U.S. at ___, 132 S. Ct. at 2600.  Therefore, we affirm the judgment of the district court in favor of the USDA.

**AFFIRMED.**

13