James M. LYNCH, Plaintiff,

v.

Walter N. TOBRINER, President, F. J. Clarke, Member, John B. Duncan, Member, Board of D. C. Commissioners, Defendants.

Civ. A. No. 4–63.

United States District Court
District of Columbia.

Jan. 12, 1965.

---

* Mr. Morris S. Davis, Director of the Yale University Computer Center, was appointed Special Master, Nov. 18, 1964.

H. Clifford Allder, Washington, D. C., for plaintiff.

Chester H. Gray, Corporation Counsel for District of Columbia, John A. Earnest and William F. Patten, Asst. Corporation Counsel for District of Columbia, for defendants.

CURRAN, District Judge.

Plaintiff, a retired officer of the Metropolitan Police Department, has applied to this court for a mandatory injunction to require the defendants, constituting the Board of Commissioners of the District of Columbia, to order plaintiff to be retired for disability due to an illness incurred in the performance of duty under the provisions of the District of Columbia Code, Title 4, Sec. 527 (1961 Edition). Plaintiff had been retired for disability under another provision of the Code granting retirement benefits for disability "due to injury received or disease contracted other than in the performance of duty". District of Columbia Code, Title 4, Sec. 526 (1961 Edition). The difference is that under the first mentioned section, plaintiff would have the benefit of a retirement annuity of at least 66⅔ per centum of his basic salary, rather than the 40 per centum as provided in the last mentioned section.

Upon the basis of an administrative record, consisting of the proceedings before the Police and Firemen's Retirement and Relief Board, the defendants, as the Board of Commissioners of the District of Columbia, sustained the action of the Police and Firemen's Retirement and Relief Board in ordering the retirement of Private Lynch for disability not incurred in the line of duty. The vote of the members of the Police and Firemen's Retirement and Relief Board was three to two, three members recommending the retirement of the plaintiff for a disability not incurred in the performance of duty, and two members dissenting, feeling that the retirement should be for a disability incurred in the performance of duty.

Plaintiff was appointed a member of the Metropolitan Police Department on April 13, 1942, apparently in good health, and served continuously until his retirement on July 14, 1961, for a disability diagnosed as essential hypertension with uncontrolled elevations in blood pressure and hypertensive cardiovascular disease.

The pertinent testimony adduced before the Police and Firemen's Retirement and Relief Board was the medical report of Dr. Victor H. Esch, Member of the Board of Police and Fire Surgeons; Dr. G. Louis Weller; and the testimony of the plaintiff himself.

The medical report of Dr. Victor H. Esch is as follows:

"Private Lynch has been under my professional care for the past 15 months because of elevations in both the systolic and diastolic blood pressures. Readings for the most part

have ranged around 220 systolic and 120 diastolic. Physical examination done on May 17, 1961, revealed the following: blood pressure was 220 systolic and 125 diastolic, the remainder of the physical examination was essentially normal. For a number of years he has been employed as a Police Department radio dispatcher. For the past year he has been troubled with headaches and dizziness which apparently are aggravated by his duties as a dispatcher. He has not responded to intensive medical therapy. The diagnoses are: (1) essential hypertension, (2) with uncontrolled elevations in blood pressure, and (3) hypertensive cardiovascular disease.

"It is believed that his condition is the direct result of the performance of his duties as a Metropolitan Policeman. I recommend that he appear before the Retirement and Relief Board for consideration of retirement. The disability rating is 100%."

Dr. G. Louis Weller testified as follows:

"Q. Doctor, I notice there is no mention here of trauma at all?

"A. Not in the letter, no sir. I think we have to consider elevated blood pressure from the standpoint of what we might call emotional trauma, not physical trauma; I think we have to differentiate those two types of trauma, the one type somebody gets hit by a prisoner or he's in a car that gets hit by another automobile, and that is what we diagnose as, or delineate as, physical trauma. The other type is when you are continually driving yourself, you're stimulating your adrenal medulla, you're releasing more and more adrenalin from your adrenal glands, your adrenalin is constricting the blood vessels, the so-called arterials, your adrenalin is undoubtedly doing a certain amount of damage to the structures in the base of the brain, and that is what we call emotional tension or stress syndrome, that is the term that is being widely used, and I think it is very descriptive, which we've used—that is, the profession has used—over a period of the last eight to ten years. And Private Lynch's case will fall into that type with repeated emotional problems."

The plaintiff described his work in the radio dispatch room as follows:

"And of course my duties the last 13 years now, I've been there since 1948 when they first opened up—why, I've been more or less under stress I would say, that would be the only expression I could use. There's no hour goes by that there isn't something happening, and unusual happenings why naturally you'd feel it more. For instance, such occasions as the Puerto Rican affair we had about five years ago; I was by myself then, I had to initiate the action there. My fellow dispatcher, there were only two dispatchers there, happened to be out of the room; and situations such as that crop up from time to time and you do have to use a little judgment and it puts you under a little unnecessary stress. And I've worked along with Chief Wallrodt here many, many times, I guess he could probably testify to that; many, many important happenings; and you do feel it, it just crops up within you. When you go home, why you're a couple, two or three hours before you're calmed down."

A. "No, I don't rotate, I work the same hours, same trick of duty."

Q. "Six in the evening till two A.M.?"

A. "Yes, Sir."

Q. "And how long have you been on those hours?"

A. "I would say about a little over two and a half years, when our prior captain was there, Captain Silvea, he's the one that asked me, it was a request. He wanted experienced men to liaison between the 4 to 12 shift and the midnight shift, and I had to remain in the—what we call the hot seat—it's the No. 2 position that talks back and forth to the cars, I remained in that seat from 10 through midnight in order to carry over any important happening that may be of interest to the midnight crew. A hold-up that may have started on the 4 to 12 that may still be in process, still may be being investigated, the car may still be out of service."

Q. "Have you been doing this work for—about 13 years?"

A. "Yes, sir, since '48."

Q. "Since that Bureau was set up?"

A. "Yes, sir."

Q. "And—but this condition apparently came—the one where you needed medical attention—about 15 months ago?"

A. "Yes, sir."

Q. "What impelled you, or what caused you to go to the Clinic for this particular condition, or did it just develop in a routine physical?"

A. "Well, I found myself taking any number of aspirin on occasions to do away with the headache. I figured something must be wrong. I couldn't have these headaches two and three times a week, it wouldn't be normal because I have no other bad habits that it would be attributed to, I don't drink or smoke, I haven't smoked for about three years and I haven't taken even a cocktail for about —almost a year and a half, just before this situation. So I knew the headache had to come from something else, and that's when I became suspicious. And pressure—you could feel it, you could feel it within you. That's when I started going up to the Clinic."

■ Public policy requires the courts to construe the provisions of the character involved in this case liberally because they serve a beneficial purpose.

■■ The word "injury" is not limited to injuries caused by violence or physical force. It must be given a broader and more liberal meaning. It includes *any* injury, or disease, or illness arising out of and in the course of the employment, which causes incapacity. Such construction must be given in order that the humane purpose of the law may be realized. Courts must keep in mind the benefits intended to be conferred by the law.

Since the evidence before the Police and Firemen's Retirement and Relief Board supports only a conclusion attributing the disability to injury received in the performance of duty, plaintiff is entitled to be retired under Title 4, Sec. 527, District of Columbia Code (1961 Edition). The humane purpose of the retirement laws would fail of accomplishment were the evidence in this case held to be insufficient to support a retirement under Title 4, Sec. 527. See Crawford v. McLaughlin, 109 U.S.App. D.C. 264, 286 F.2d 821.

Counsel for the plaintiff will prepare the appropriate order not inconsistent with this opinion.