Arthur B. McNEAL, Petitioner,

v.

**POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.**

No. 84–1155.

District of Columbia Court of Appeals.

Argued Dec. 18, 1984.

Decided Feb. 28, 1985.

---

Harry Toussaint Alexander, Jr., Washington, D.C., for petitioner.

Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before PRYOR, Chief Judge, and NEBEKER and MACK, Associate Judges.

PER CURIAM:

Petitioner, Arthur B. McNeal, appeals from a decision by respondent, the Police and Firefighters' Retirement and Relief Board (the Board), terminating his disability annuity on the grounds that petitioner had been restored to earning capacity within the meaning of D.C.Code § 4–620(a) (1981). Petitioner contends that the Board's decision was arbitrary and capricious, and was not supported by substantial evidence. Specifically, petitioner argues that the Board erred in applying the provi-

sions of § 4–620(a) to him, in determining his right to benefits. Petitioner also challenges the constitutionality of § 4–620(a) on equal protection and due process grounds. Finding none of petitioner's arguments persuasive, we affirm.

Petitioner was an officer of the District of Columbia Metropolitan Police Department (MPD) from April 1963 until he retired on disability in November 1969. In April 1984, the MPD Internal Affairs Division notified the Board that petitioner had been restored to "earning capacity" within the meaning of D.C.Code § 4–620(a) (1981), and that, therefore, petitioner's retirement benefits should be terminated.

At a hearing before the Board, Sergeant Arnold Redmond of the MPD Casualty Investigation Branch testified that in 1983 petitioner had earned a gross income of $23,865.36 as a buyer for the Mitre Corporation. Petitioner, while conceding that he earned $23,865.36 in 1983, moved to dismiss the case on the ground that the Board was improperly proceeding against him under § 4–620(a).[1] According to appellant, § 4–620(a) did not apply to an annuitant such as himself who retired prior to November 17, 1979, the effective date of the statute's enactment; rather, the predecessor law, D.C.Code § 4–530 (1973),[2] applied to him. Thus, appellant contended that the MPD was required to investigate petitioner's income for two years, as set forth in § 4–530,

and not one year, as they had done pursuant to § 4–620(a), in recommending that petitioner's benefits be terminated. The Board rejected this argument and refused to dismiss the case.

Following the hearing, the Board issued findings of fact and conclusions of law. The Board found that (1) petitioner's gross earnings for the year 1983 were $23,865.36;[3] (2) the current salary for a MPD officer in the position petitioner had occupied immediately prior to his retirement was $24,825; (3) the maximum income limitation for pensioners under § 4–620(a)— 80% of the current rate of compensation of the position occupied immediately prior to retirement—was $19,860; and (4) petitioner's earned income for 1983, accordingly, exceeded the statutory income limitation by $4,005.36. The Board concluded that petitioner had been restored to "earning capacity" within the meaning of § 4–620(a), and that his annuity should, therefore, be terminated effective forty-five days from the date of the Board's order. This appeal followed.

I

■ Appellant argues that in applying § 4–620(a) to him, the Board's action was "arbitrary, capricious," and "otherwise not in accordance with law." *See* D.C.Code § 1–1510(a)(3)(A) (1981). The relevant leg-

---

1. Section 4–620(a) provides in pertinent part:
   (1) If any annuitant retired under § 4–615 or 4–616, before reaching the age of 50, recovers from his disability or is restored to an earning capacity fairly comparable to the current rate of compensation of the position occupied at the time of retirement, payment of the annuity shall cease:
   \* \* \* \* \* \*
   (2) Earning capacity shall be deemed restored if, ... *in any calendar year* in the case of an annuitant who was an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia, the income of the annuitant from wages or self-employment or both shall be equal to at least 80 per centum of the current rate of compensation of the position occupied immediately prior to retirement. (Emphasis added.)

2. Section 4–530 provides in pertinent part:
   (1) If any annuitant retired under section 4–526 or 4–527, before reaching the age of fifty, recovers from his disability or is restored to an earning capacity fairly comparable to the current rate of compensation of the position occupied at the time of retirement, payment of the annuity shall cease .... Earning capacity shall be deemed restored if in each of *two succeeding calendar years* the income of the annuitant from wages or self-employment or both shall be equal to at least 80 per centum of the current rate of compensation of the position occupied immediately prior to retirement. (Emphasis added.)

3. The Board made no findings for the year 1982.

islative history, however, supports the Board's position that § 4–620(a) was intended to apply to both current and future retirees.

Section 4–620(a) was promulgated as part of the District of Columbia Retirement Reform Act, Pub.L. No. 96–122, 93 Stat. 866 (1979) (the Reform Act). The Reform Act was a response to the then financially strapped District of Columbia retirement programs. The purpose of the Reform Act was to provide adequate funding for the pension plans of District of Columbia police, firefighters, teachers and judges, and to close up what Congress believed were a number of costly loopholes in the benefit provisions of the regulatory statutes governing those plans. *See* S.REP. NO. 237, 96th Cong., 1st Sess. 3–6 (1979) (SENATE REPORT); H.R.REP. No. 155, 96th Cong., 1st Sess. 1–2 (1979) (HOUSE REPORT).

The HOUSE REPORT is silent on the applicability, to current disability retirees, of the provisions concerning the termination of annuity payments. The SENATE REPORT, however, directly supports the Board's position that the disability annuity amendments in the Reform Act were intended to apply to current retirees as well as future retirees.

The SENATE REPORT provides generally that the Act will apply to "current retirees, current employees and new hires." S.REP. No. 237, *supra* at 6–7. More significantly, in reference to the provision dealing with the termination of disability annuity payments, the SENATE REPORT explains that

current law allows an annuitant to earn up to 80 percent of the current salary of his last-held position in each of two consecutive years before putting his disability pension in jeopardy ... the [new] bill changes this to 80 percent in any 1 year *for those currently retired on disability.*

*Id.* at 5 (emphasis added). In a related provision, amending the reporting requirements for disability annuitants, the Reform Act states, "the one year grace period is eliminated and all current and future retirees are required to submit to medical examinations and to file reports of income on an annual basis." *Id.* at 20.

The many problems affecting the District of Columbia's retirement programs necessitated a major overhaul by Congress of the laws governing retirement benefits of city personnel. While there was a general reluctance to "balance the budget on the backs of those who are retired and trying to live on a fixed income," *see* 125 CONG. REC. 25,912 (1979) (remarks of Rep. Dellums), there was also a marked recognition that without comprehensive reform of the existing pension system—necessarily affecting both "current employees and [employees] hired in the future," SENATE REPORT, *supra* at 4, it would be impossible to insure adequate funding for the retirement costs of the city's skilled public servants.

Accordingly, the legislative history of the Reform Act plainly indicates Congress' intention to revise and reform the guidelines governing disability pensions for both current and future retirees in the District of Columbia. Thus, the Board's application of § 4–620(a) to petitioner was consistent with the statutory scheme established by Congress, and was not arbitrary or capricious.

Moreover, our previous decisions involving the Board's use of § 4–620(a) are consistent with such an interpretation. *See, e.g., Simmons v. Police and Firefighters' Retirement and Relief Board,* 478 A.2d 1093 (D.C.1984) (applying § 4–620(a) to 1968 retiree where investigation of earnings occurred in 1982 concerning income for 1980); *McMullen v. Police and Firefighters' Retirement and Relief Board,* 465 A.2d 364 (D.C.1983) (applying § 4–620(a) to 1975 retiree where investigation of earnings occurred in 1982, concerning income for 1980); *Roberts v. Police and Firefighters' Retirement and Relief Board,* 412 A.2d 47 (D.C.1980) (applying § 4–530 to 1963 retiree where investigation

of earnings occurred in 1978 concerning income for 1974 and 1975).

## II

■ Appellant also asserts that the Board's decision must be reversed because it is not supported by substantial evidence. Under the District of Columbia Administrative Procedure Act, D.C.Code § 1–1510 (1981), we must affirm agency findings of fact and conclusions of law if they are "supported by and in accordance with reliable and substantive evidence" in the record. *See Kegley v. District of Columbia*, 440 A.2d 1013, 1018 (D.C.1982). We may not substitute our judgment for that of the agency. *Id.; Jones v. Police and Firemen's Retirement and Relief Board*, 375 A.2d 1 (D.C.1977).

■ The Board conducted an administrative hearing at which both petitioner and respondent were present. The undisputed testimony at the hearing showed that appellant's gross income in 1983 of $23,865.36 exceeded the statutory income limitation for annuitants who retired on disability, by $4,005.36. Following the hearing, the Board issued the required findings of fact and conclusions of law based on the testimony admitted at the hearing as well as documentary evidence. Based on the above evidence, the Board found pursuant to § 4–620(a), that petitioner had been restored to "earning capacity," and that, therefore, his annuity should be terminated. Upon reviewing the record, we conclude that the Board's findings of fact and

conclusions of law are supported by substantial evidence.

## III

■ Finally, petitioner challenges the Board's decision on the grounds that § 4–620(a), as applied to him, violated his due process rights under the Fifth Amendment. This argument is without merit.[4]

■ Petitioner contends correctly that he has a property interest, protected by the due process clause of the Fifth Amendment in his disability annuity. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Dodge v. Board of Education*, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57 (1937); *American Postal Worker's Union v. United States Postal Service*, 227 U.S.App.D.C. 351, 707 F.2d 548, *cert. denied*, —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

Petitioner's annuity, however, is a qualified pension, subject to termination upon his restoration to earning capacity, as defined by statute. While petitioner has a protected property interest in his annuity benefits he has never had a protected interest in the method the government uses to determine restoration to earning capacity.

The Supreme Court has stated that "legislative Acts adjusting the burdens and benefits of economic life [carry] ... a presumption of constitutionality and ... the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irra-

---

**4.** Petitioner also claims that § 4–620(a), as enacted by Congress was arbitrary legislation—without a rational basis—violative of the equal protection clause of the Fifth Amendment. Specifically, petitioner claims that because the Reform Act legislated changes in retirement benefits for District of Columbia police officers and not federal law enforcement officers, working in the District of Columbia, it created an unconstitutional classification. We are not persuaded.

Petitioner has failed to show that the Reform Act as enacted was not rationally related to a legitimate governmental interest. On the contrary, Congress in attempting to restore the financial viability of the city's pension program,

could have reasonably concluded that legislation was needed in certain areas and not in others. "The constitutional call for equality of treatment 'does not require [a choice] between attacking every aspect of a problem or not attacking the problem at all.'" *Haviland v. Butz*, 177 U.S.App.D.C. 22, 30, 543 F.2d 169, 177 (1976), *cert. denied*, 429 U.S. 832, 97 S.Ct. 95, 50 L.Ed.2d 97 (1977) (quoting *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970)); *see also Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed.2d 563 (1955) (legislature may "select one phase of one field and apply a remedy there, neglecting the others").

tional way." *Pension Benefit Guaranty Corp. v. R.A. Gray Co.,* — U.S. ——, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984) (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)); *see also National Treasury Employees v. Devine,* 591 F.Supp. 1143 (D.D.C.1984); *Maryland State Teacher's Association v. Hughes,* 594 F.Supp. 1353, 1372 (D.Md.1984).

The legislation at issue here is justified by a rational legislative purpose. In 1979, the city's retirement system was threatened with financial collapse. The Reform Act served the public interest by legislating changes in the law designed to secure the actuarial soundness of the pension system. *See Maryland State Teacher's Association v. Hughes, supra,* 594 F.Supp. at 1370.

Moreover, while petitioner had an interest in receipt of his disability payments, he did not have a protected expectation that Congress would never legislate in the area of disability benefits following his retirement. *Cf. Richardson v. Belcher,* 404 U.S. 78, 81–82, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971) ("an expectation of public benefits [does not] confer a contractual right to receive the expected amounts," nor does a property interest in those payments, "impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits"). Under the Reform Act petitioner's overall right to receive disability payments was maintained. In order to insure the financial viability of the retirement program as a whole, Congress altered, among other things, the method by which an annuitant was deemed "restored to earning capacity." *See Scholtz Partnership v. District of Columbia Rental Accommodations Commission,* 427 A.2d 905, 918–19 (D.C.1981).

Thus, while we agree that petitioner had a property interest in his annuity, we cannot say that application of § 4–620(a) to petitioner impaired this right. According-

ly, we find no constitutional basis for reversal.

*Affirmed.*