**Thomas E. RIDGE, Petitioner,**

v.

**POLICE AND FIREFIGHTERS RETIREMENT AND RELIEF BOARD, Respondent.**

No. 85–474.

District of Columbia Court of Appeals.

Submitted Dec. 9, 1985.

Decided June 26, 1986.

---

**420**

whether the Board should have backdated the annuity payments to the date of eligibility for reestablishment rather than making the reestablished annuity effective only from the later date on which the Board reached its decision. We agree with petitioner Thomas Ridge that the earlier date applies. We hold also that the Board may offset against the reestablished annuity any payments received by the annuitant during what was later recognized as a period of temporary ineligibility. Finally, we hold that the Board's finding of a willful statutory violation was not supported by substantial evidence and, in addition, that the Board failed to give petitioner adequate notice of its threatened action.[1] We reverse.

Robert E. Greenberg, Robert E. Deso, and Barry D. Trebach, Washington, D.C., were on brief, for petitioner.

Inez Smith Reid, Corp. Counsel at the time the brief was filed, John H. Suda, Principal Deputy Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Richard B. Nettler, Assist. Corp. Counsel, Washington, D.C., were on brief, for respondent.

Before NEBEKER, MACK and BELSON, Associate Judges.

MACK, Associate Judge:

■ The Police and Firefighters Retirement and Relief Board ("the Board") restored disability benefits to an annuitant who had been temporarily above the statutory income limits. We are asked to decide

**I**

On January 12, 1955, petitioner Thomas Ridge joined the District of Columbia Metropolitan Police Department. He subsequently suffered a disability incurred or aggravated in the course of duty and was retired from his rank as officer on April 1, 1967. After his retirement, petitioner entered into business as the sole proprietor of an Exxon service station. Petitioner used the income from this enterprise to supplement his disability annuity, set by statute at between 66⅔ and 70% of his average pay for each year of his service. D.C.Code § 4–616(a) (1981).

A disabled annuitant's "earning capacity" is deemed restored, and benefits therefore revoked, if his or her income from wages or self-employment for any calendar year equals at least 80% of the current rate of pay in the position held immediately

---

1. The Board suggests that its reestablishment decision is invalid on the ground that it erroneously relied on the "net profits" rather than the "gross receipts or sales" of petitioner's sole proprietorship. These amounts were reported on lines 1a and 33 respectively of his 1981 Internal Revenue Service Form 1040, Schedule C, Profit or (Loss) from Business or Profession. In *Roberts v. Police & Firemen's Retirement & Relief Bd.*, 412 A.2d 47, 50 (D.C.1980), we expressly left open the question of what constitutes "income" with respect to self-employed annuitants. We now reject the Board's proposed meaning, because it would unfairly discriminate against self-employed as opposed to salaried annuitants. Our decision in *Simmons v. Police & Firefighters' Retirement & Relief Bd.*, 478 A.2d 1093, 1095–96 (D.C.1984), published after the reestablishment order was issued, does not dictate a contrary result.

before retirement. *Id.* § 4–620(a)(2).[2] On November 19, 1981, the Board ordered that petitioner's disability annuity be revoked on the ground that his income for calendar year 1980 had risen above the statutory limit.[3] Petitioner's annuity payments were stopped forty-five days later, as the statute requires, on January 4, 1982. *Id.* § 4–620(a)(1)(C).

Although petitioner's income for calendar year 1980 was above the 80% limit, his 1981 earnings fell back below that level, making him eligible for reestablishment of his disability annuity. *Id.* § 4–620(a)(2).[4] On April 9, 1982, shortly after the close of the 1981 calendar year which brought him back within the eligibility limits, petitioner formally requested the Board to reinstate his annuity due to his changed circumstances. After a protracted transmission of documents from petitioner to the Board, a hearing on his reestablishment claim was finally held on September 15, 1983. The Board, having examined documentary evidence of petitioner's earnings for 1981 and 1982, and having heard testimony from various individuals including petitioner's Certified Public Accountant, concluded that he was in compliance with the statutory income requirements for those years. On October 4, 1983, the Board issued an order reinstating the annuity effective September 22, 1983, the date on which the Board reached its reestablishment decision one week after the hearing was held.

Petitioner sought review in this court of the Board's determination that September 22, 1983, was the effective date from which his annuity should be reestablished. He argued that the appropriate point for payments to commence was not the date on which the Board—after extended proceedings—arrived at its decision to reinstate the annuity, but rather the earlier date on which he had become eligible for reestablishment. Under this analysis, as we discuss below, he would be entitled not only to payments running from September 22, 1983, but also to payments retroactive to January 1, 1982.

Neither the challenged order of October 4, 1983, nor the decision upon which that order was based, indicated that the Board had ever considered the possibility of backdating the annuity from the date of its reestablishment decision to the date of eligibility. On January 4, 1985, after requesting supplemental briefs on this and other issues, we remanded the case back to the Board to consider and determine the appropriate date for reestablishment of the annuity. *Ridge v. Police & Firefighters Retirement & Relief Board,* No. 83–1206 (D.C.January 4, 1985) (*Ridge I*). We suggested, in our unpublished order remanding *Ridge I,* that "the Board adopt regulations addressing this issue, in order that annuitants may be put on notice of the applicable rules and that future cases may be decided appropriately." *Id.* at 2.

On April 10, 1985, on remand from *Ridge I,* the Board affirmed its prior ruling that payments would recommence from September 22, 1983. This is the final decision and order that we now review. The decision set forth the principle that the Board may "withhold reinstatement of an annuity until it is capable of making such a determination." The Board also held that petitioner

---

2. The relevant part of that section provides: Earning capacity shall be deemed restored if … in any calendar year in the case of an annuitant who was an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia, the income of the annuitant from wages or self-employment or both shall be equal to at least 80 per centum of the current rate of compensation of the position occupied immediately prior to retirement.

3. We affirmed the Board's decision in an unpublished opinion. *Ridge v. Police & Firefighters Retirement & Relief Bd.,* No. 81–1366 (D.C. November 18, 1982).

4. The relevant part of that section provides: Nothing in this section shall preclude such member from having an annuity reestablished if his [or her] disability recurs, or when his [or her] earning capacity is less than 80 per centum of the rate of compensation of the position occupied immediately prior to retirement for any full year thereafter. …

had willfully failed to provide required information until September 22, 1983, the date on which the decision to reestablish was made, and that his willful delay justified the loss of benefits up to that time. D.C.Code § 4–620(c)(5) (1981). In so finding, the Board introduced a new issue into the case.

Before proceeding to address petitioner's contentions, we note that this case presents a number of questions not expressly answered by the provisions of the governing Police and Firefighters Retirement and Disability Act, D.C.Code §§ 4–601 to 634 (1981) ("the Act" or "the retirement statute"). Specifically, the Act does not set forth the procedure to be followed by either the annuitant or the Board when reestablishing temporarily discontinued payments; it does not expressly indicate whether reestablishment operates retroactively to cover the lapse between the date of eligibility and the date upon which the Board arrives at its reestablishment decision; and the Act offers no express guidance as to whether the Board may offset against the reestablished annuity the payments which the annuitant received during the period before his or her ineligibility became apparent. Despite our prompting in *Ridge I*, it does not appear that the Board has adopted regulations which would clarify any of these issues.

## II

"We may overturn the Board's decision only if its findings are unsupported by substantial evidence in the record as a whole, or if it is grounded on a faulty legal premise." *Neer v. District of Columbia Police & Firemen's Retirement & Relief Board*, 415 A.2d 523, 526 (D.C.1980). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Board*, 366 A.2d 1110, 1112 (D.C.1976) (quoting *Consolidated Edison*

*Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Bearing these principles in mind, we consider whether the Board properly withheld petitioner's reestablished annuity payments on the ground that he had willfully failed to timely submit information as required under § 4–620(c)(5). We conclude that the Board's action was not supported by substantial evidence; we further hold that, in reaching its finding of a willful statutory violation, the Board failed to observe the notice requirements of due process. The Board's withholding of funds in reliance upon § 4–620(c)(5) was flawed in both respects.

The Board held, on April 10, 1985, that petitioner had willfully failed to timely submit required information and that it was therefore empowered to withhold annuity payments for a period during which petitioner was otherwise eligible for reestablishment. The Board stated that "the annuitant was not cooperative in terms of providing all the necessary information at the outset, thereby resulting in the delay of a determination and decision." For this reason, the Board affirmed its previous decision to reestablish the annuity effective September 22, 1983; the Board held that it possessed adequate information of record no earlier than that date and that petitioner was willfully responsible for the intervening delay. The reestablishment decision which the Board affirmed, however, contained no such finding; our remand of *Ridge I* did not request the Board to address any possibility of willful delay under § 4–620(c)(5); and at no point, either before or after our remand, did the Board advise petitioner that it was considering the willfulness issue with its potential loss of benefits.

The relevant parts of § 4–620(c)(5) provide:

(A) Any annuitant who is retired ... and who prior to such retirement was an officer or member of the Metropolitan

Police force ... shall, at such times as the [Board] shall by regulation prescribe,[5] submit to the [Board] *a notarized statement* containing such information as the [Board] shall by regulation require with respect to the income received by such annuitant from wages or self-employment, or both. After examining such statement, the [Board] may require such annuitant to submit to the [Board] *a further notarized statement* containing such additional information with respect to the income received by such annuitant from wages or self-employment, or both, as the [Board] deems appropriate.

(B) .... Any such annuitant who refuses or otherwise willfully fails to timely submit *such statement as required by this section* ... shall not be eligible to receive such annuity or parts thereof for the period beginning on the date after the final day for timely filing of such statement and ending on the date on which the [Board] receives such statement.

(Emphasis added.) We have recognized that petitioner has a property interest, protected by the Due Process Clause of the Fifth Amendment, in his disability annuity.[6] *McNeal v. Police & Firefighters Retirement & Relief Board,* 488 A.2d 931, 935 (D.C.1985); *see generally Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (citing Reich, *The New Property,* 73 YALE L.J. 733 (1964)). It follows that the requirements of due process must be read into § 4–620(c)(5). *See generally* 3 SUTHERLAND STATUTORY CONSTRUCTION § 65.04 (4th ed. 1973).

■ The Board's finding of a § 4–620(c)(5) violation is unsupported by substantial evidence. That section permits the Board to withhold benefits only for willful delay or refusal to submit a required "notarized statement." The only "notarized statement" ever requested by the Board was a "Disability Retiree Employment Questionnaire and Report of Income." This document was to be returned to the Board within thirty days of its receipt by petitioner. It warned that "[f]ailure to comply with these requirements may result in the suspension of your retirement benefits." Petitioner returned the executed and notarized form to the Board, within the thirty day deadline, on May 11, 1982.[7] Nothing in the record indicates that petitioner received any request for submission of "a further notarized statement containing such additional information ... as the [Board] deems appropriate." Petitioner fully complied with the only § 4–620(c)(5)(A) request he ever received and so could not be subject to § 4–620(c)(5)(B) penalties for willful failure to timely file any such required statement.

■ It is true, although immaterial to the question of eligibility for benefits, that for over a year after the application was filed, petitioner did receive sporadic requests for additional information. Some of these were clear, others more cryptic. But none was for the "further notarized statement" contemplated in § 4–620(c)(5)(A), so none triggered off the possibility of penalties under § 4–620(c)(5)(B).

In any event, petitioner responded to all of these informal requests for additional

---

5. In light of our disposition of this case, we need not consider whether the Board's failure to prescribe regulations under § 4–620(c)(5)(A) precludes it from withholding benefits in reliance upon § 4–620(c)(5)(B).

6. The Fifth Amendment guarantees that no person shall "be deprived of life, liberty or property without due process of law."

7. The record does not reveal when petitioner received this document for completion and return, but the Board does not dispute petitioner's assertion that it was on April 22, 1982. Nor, in the absence of record evidence on the matter, could the Board contest petitioner's representation. The Board invokes the statutory provision, in this case § 4–620(c)(5), and therefore carries the burden of proof on that issue. *Kea v. Police & Firemen's Retirement & Relief Bd.,* 429 A.2d 174, 175 (D.C.1981); D.C.Code § 1–1509(b) (1981).

information in a reasonable manner.[8] With one exception, none of the later requests carried a deadline, and none suggested that any adverse consequences might result from a delay in responding. Petitioner was faced at the outset with a complete absence of any instructions on how to proceed with his claim for reestablishment. Not unreasonably, he sent the Board a copy of his Internal Revenue Service Form 1040, Schedule C, Profit or (Loss) from Business or Profession, together with various other documents. These were attached to his formal request for reestablishment dated April 9, 1982, about three months after the close of the financial year upon which he based his claim. The Board ultimately rendered its favorable decision on his request for reestablishment over a year and a half after the claim was filed. The only delays of appreciable length during the protracted intervening correspondence were both attributable to the Board: five months between May 11, 1982, and September 16, 1982, and four months between October 25, 1982, and February 22, 1983. Of the only two deadlines ever given to petitioner, as we have already noted, he fully complied with that which threatened § 4–620(c)(5) penalties. On the other occasion petitioner requested, and was granted, a thirty to sixty day postponement of the hearing. Petitioner sought this postponement on the advice of his Certified Public Accountant in order to prepare extensive documentation for two years of his business. This documentation had been newly requested by the Board, at three weeks notice, just prior to the hearing, which the Board did not schedule until over a year after the claim was filed. Even if we did see an unreasonable delay on petitioner's part, as already pointed out, these repeated requests for additional information would be immaterial to the question of eligibility for benefits, because none required a "further notarized statement" which might trigger the possibility of § 4–620(c)(5) penalties for willful delay in responding.[9] We conclude that the Board's denial of benefits on the ground of willful delay in submitting a required statement was not supported by substantial evidence.

■ In addition to the lack of substantial evidence, the Board never met its constitutional obligation to give petitioner fair and adequate notice of the threatened willfullness finding and its possible adverse consequences. We have held that "[i]n general, an individual is entitled to fair and adequate notice of administrative proceedings that will affect his [or her] rights, in order that he [or she] may have an opportunity to defend his [or her] position." *Carroll v. District of Columbia Department of Employment Services*, 487 A.2d 622, 623 (D.C. 1985). We have also observed that "[t]he requirements of procedural due process are met if upon review the court is satisfied that a complainant was given adequate opportunity to prepare and present [his or her] position to the [Board] and that no prejudice resulted from the originally deficient notice." *Watergate Improvement Association v. Public Service Commission*, 326 A.2d 778, 786 (D.C.1974); *see also*

---

8. A factual chronology of petitioner's reestablishment claim is contained in the appendix to this opinion.

9. Although the Board's power to withhold benefits is limited to requests for notarized statements within the terms of § 4–620(c)(5)(A), the Board has alternative sanctions at its disposal if the annuitant fails to provide information requested in some other manner. D.C.Code § 4–627(a) (1981) provides, in relevant part:

The [Board] is authorized to administer oaths and affirmations, [and] may require by subpoena or otherwise the attendance and testimony of witnesses and the production of documents at any designated place. In the event of contumacy or refusal to obey any such subpoena or requirement under this section, the [Board] may apply to the Superior Court of the District of Columbia for an order requiring obedience thereto. Thereupon the Court, with or without notice and hearing, as it in its discretion may decide, shall make such order as is proper and may punish as a contempt any failure to comply with such order....

The record does not suggest that any such sanctions would have been appropriate in the present case.

*Babazedeh v. District of Columbia Hacker's License Appeal Board,* 390 A.2d 1004, 1008–09 (D.C.1978); D.C.Code § 1–1509(a) (1981 & 1985 Supp.).[10] Petitioner first learned of the § 4–620(c)(5) issue only after an actual loss of benefits had been imposed on that ground after three years of proceedings on unrelated aspects of his claim.[11] In the case before us notice was absent, while prejudice was not.

■ We therefore hold that because the finding of a § 4–620(c)(5) violation was unsupported by substantial evidence, and because the ensuing loss of benefits was imposed without any notice of the threatened finding, the Board was not empowered to withhold petitioner's annuity on the ground of a willful failure to timely file required information.[12]

### III

■ Having determined that the Board's reliance on § 4–620(c)(5) was misplaced, we must now consider a broader question: does the Board have a general obligation to reestablish a temporarily discontinued annuity retroactive to the date of eligibility? We accept petitioner's argument that it does.

The retroactivity issue, a matter of some importance to reestablished annuitants, was one which we thought worthy of supplemental briefing in *Ridge I.* Then, at the request of the Board and because the issue had not arisen prior to its restablishment decision, we remanded *Ridge I* back to the Board so that it could make the initial determination as to the appropriate date upon which the annuity should be reinstated. On remand, the Board did not directly answer our question. Instead, it primarily based its decision on the hitherto unmentioned and invalid ground that petitioner had forfeited his right to retroactive benefits due to an alleged willful statutory violation.[13]

The Board's decision of April 10, 1985, nonetheless strongly suggested that the Board claims a general power to make reestablishment of annuity payments effective only from the date on which it has all relevant information:

> Since the Board did not possess sufficient evidence of record until September 22, 1983, it could not render a just and fair decision prior to that date, that the annuity be reestablished.... Section 4–

*v. Police & Firefighters' Retirement & Relief Bd., supra* note 1, 478 A.2d 1093—extends only to "the period beginning on the date after the final day for timely filing of such statement and ending on the date on which the [Board] receives such statement." The Act does not permit the Board to withhold the annuity for any period before the required statement falls due, nor for any period after that statement has been submitted. The Board improperly included both of these unmeasured periods in its denial of benefits for the entire time span between the date of petitioner's eligibility for reestablishment and its decision dated September 22, 1983. This is immaterial to the outcome of the present case, as we conclude that petitioner was guilty of no § 4–620(c)(5) violation in the first place.

10. That section provides, in relevant part:

> In any contested case, all parties thereto shall be given reasonable notice of the afforded hearing by the Mayor or the agency, as the case may be. The notice shall state the time, place, and issues involved, but if, by reason of the nature of the proceedings, the Mayor or the agency determine[s] that the issues cannot be fully stated in advance of the hearing, or *if subsequent amendment of the issues is necessary they shall be stated as soon as practicable, and opportunity shall be afforded all parties to present evidence and argument with respect thereto.*

(Emphasis added.)

11. This Kafkaesque chain of secrecy is not what the Due Process Clause contemplates. *See* F. KAFKA, THE TRIAL (1956).

12. Even apart from the lack of substantial evidence and lack of due process, the Board failed to comply with the terms of § 4–620(c)(5)(B). Ineligibility for willful delay or refusal in filing a required notarized statement—as opposed to willful misrepresentation therein, *see Simmons*

13. Corporation Counsel vigorously defends the Board's finding of a willful statutory violation, although we find it supported neither by substantial evidence nor by due process. We would have preferred further guidance on the issues which required supplemental briefing in *Ridge I* and which are back before us in this case.

620 of the Code does not provide for the retroactive reestablishment of an annuity. ... That portion of the statute which provides that an annuitant is not precluded from having his or her annuity reestablished is not, by its very terms, a limitation on the Board but a grant of authority to the Board to reestablish an annuity.

*Id.* at 10–11. In response to the present petition for review of its decision and order, the Board unequivocally adopts the position that it is not required to reestablish an annuity retroactive to the date of eligibility:

If an annuitant properly files for reestablishment of his or her annuity and provides the Board with such information as is necessary to determine eligibility, the annuity can be reestablished as soon as possible. The date of reestablishment is ultimately in the hands of the annuitant seeking it. Thus, an annuity could, in the Board's discretion, be reinstated retroactive to the date the application was filed, or retroactive to January 1 of the calendar year in which the annuitant was eligible for reinstatement, or at any other period of time after an application can be filed so long as the Board explains its reasons for acting as it does. Neither D.C.Code § 4–620 nor any decision of this court requires that reinstatement be on any particular date.

Brief at 9 (footnote omitted).

■ "Absent any [l]egislative direction on how to interpret its regulatory statute, the administrative agency charged with enforcing the statute has discretion to give meaning to the contents of the statute." *Roberts, supra* note 1, 412 A.2d at 50. This court defers to any reasonable construction adopted by the agency charged with enforcement of the regulatory statute. *E.g., Lee v. District of Columbia Department of Employment Services,* 509 A.2d 100, 101–102 (D.C.1986); *Quality Management, Inc. v. District of Columbia Rental Housing Commission,* 505 A.2d 73, 75 (D.C.1986). We are required, however, to decide all relevant questions of law when presented and to be the ultimate interpreter of the statutory provisions from which the Board, as a creature of the legislature, derives its powers. *Id.;* D.C.Code § 1–1510 (1981). In the present case, we regard as an unreasonable construction of the retirement statute the assertion that the Board has broad discretion not to reestablish the annuity payments retroactive to the date of eligibility. We therefore reject the Board's position and, exercising our ultimate responsibility to interpret the retirement statute, hold that retroactive reestablishment of the annuity is required.

■ We are guided towards this conclusion by the public policy which requires us to construe the retirement statute liberally in light of its humane purpose. *Roberts, supra* note 1, 412 A.2d at 51; *Hyde v. Tobriner,* 117 U.S.App.D.C. 311, 313, 329 F.2d 879, 881 (1964); *Crawford v. McLaughlin,* 109 U.S.App.D.C. 264, 265, 286 F.2d 821, 822 (1960); *Lynch v. Tobriner,* 237 F.Supp. 313, 316 (D.D.C.1965). We are also mindful of the fact, already noted, that petitioner's property interest in his disability annuity is protected by the Due Process Clause of the Fifth Amendment. *McNeal v. Police & Firefighters Retirement & Relief Board, supra,* 488 A.2d at 935.

The Board's argument that it may choose the point at which to reestablish a temporarily discontinued annuity is fundamentally at odds with its simultaneous assertion that "[t]he date of reestablishment is ultimately in the hands of the annuitant seeking it." There are at least two stages in any reestablishment claim which are not under the control of the annuitant. First, the annuitant must assemble proof of his or her income for the preceding year and present it to the Board; a reasonable period must be afforded for the annuitant to accomplish this purpose. Then, once this necessary information has been submitted, there will be some administrative delay while the Board determines whether the statutory eligibility requirements are met;

its duration will depend upon the speed of the Board's internal adjudicative processes and will, presumably, vary from year to year and from annuitant to annuitant. Neither of these delays accrues through any fault of the annuitant and both may occur during a period in which the discontinued annuitant is eligible for reestablishment. These periods may sometimes be intermingled if, as was the case here, the Board requires additional information after the claim is filed. The only delay which the annuitant can truly be said to control is that which may occur when the annuitant has been given fair and adequate notice of what information is required by the Board and has nonetheless refused or failed to provide such information within a reasonable time.

Nothing in the Police and Firefighters Retirement and Disability Act suggests that the legislature intended to attach a penalty to an annuitant's temporary ineligibility. The retirement statute was originally enacted in 1957, its stated purpose being to provide benefits comparable to those given under the federal Civil Service Retirement Act Amendments of 1956. *See Roberts, supra* note 1, 412 A.2d at 50; S.REP. NO. 699, 85th Cong., 1st Sess. 2 (1957). In *Roberts,* we treated the purpose of the federal reestablishment clause, inserted as a 1961 amendment to the Civil Service Retirement Act, as identical to that underlying the corresponding provision in the District's 1957 Act. Drawing from the legislative history of the federal reestablishment clause, we observed that: "The clear legislative intent of the amendment was to make annuity payments available as needed. Need is established by the eighty percent limit." 412 A.2d at 51. We approved as sound the policy expressed in a letter from John W. Macy, Jr., Chairman of the Civil Service Commission, to Congressman Rayburn, House Speaker: "It is believed that the knowledge of annuity again being available if needed would encourage the annuitant to return to gainful employment and earn to his [or her] fullest capabilities without fearing a future loss of

disability annuity should income-producing capacity cease." *Reprinted in* 1961 U.S. CODE CONG. & AD.NEWS 3176, 3177 (*quoted in Roberts, supra* note 1, 412 A.2d at 51). In *Roberts,* our endorsement of Chairman Macy's logic compelled us to reject as unreasonable a statutory construction urged by the Board which "could result in an annuitant having to subsist upon a restricted income for one full year following the termination of his [or her] annuity payments" and which would therefore "make an annuitant reluctant to return to gainful employment." 412 A.2d at 51. The *Roberts* reasoning applies equally in the present case.

Petitioner's contention that he is entitled to payments retroactive to the date of his eligibility for reestablishment is thus supported by the humane purpose of the retirement statute, the Fifth Amendment mandate that we respect petitioner's property rights in the annuity, and the public policy which encourages disabled annuitants to make the fullest use of their earning capacities without fear of losing entitlements for which they are otherwise eligible.

We search in vain for countervailing considerations which would support the Board's position that it may, in its discretion, withhold annuity payments falling due before the date of its reestablishment decision. Reestablishment retroactive to the date of eligibility requires only simple arithmetic calculations and payment of a lump sum; it does not require additional proceedings or investigation. The Board is protected from willful failure or refusal to submit required information in a timely manner by proper application of the § 4–620(c)(5) penalty provisions and the additional § 4–627(a) sanctions. No legitimate interest of the Board is served by denying a reestablished annuitant entitlements backdated to the date of eligibility.

"We are not obliged to stand aside and affirm an administrative determination which reflects a misconception of the rele-

vant law or a faulty application of the law." *Thomas v. District of Columbia Department of Labor,* 409 A.2d 164, 169 (D.C.1979). Petitioner was entitled to have his disability payments backdated to the first date of the year in which he became eligible for reestablishment of his annuity. As the Board found petitioner within the statutory eligibility limits from 1981 onwards, its reestablishment decision must operate retroactively to January 1 of the following year.[14]

## IV

■ Finally, we must determine whether the Board is empowered to offset against the retroactively reestablished annuity the amount received by petitioner during the period for which he subsequently proved to be ineligible. This was another issue on which we requested supplemental briefing prior to our remand in *Ridge I.* We defer to the Board's claim that it does have such power, because that is a reasonable construction of the retirement statute which the Board is charged to implement. *Lee v. District of Columbia Department of Employment Services, supra,* 509 A.2d at 101–102; *Quality Management, Inc. v. District of Columbia Rental Housing Commission, supra,* 505 A.2d at 75; *Roberts, supra* note 1, 412 A.2d at 50. While petitioner is entitled to reestablished payments retroactive to January 1, 1982, the first date of the year following that in which his income fell back below the 80% eligibility limit, the Board may offset from the amount owed to petitioner the payments he received during calendar year 1981, the period for which it was later

recognized that he was ineligible because his income for the preceding calendar year had temporarily risen above the statutory ceiling.

An annuitant whose income has risen above the eligibility limit will almost always have received payments during an ineligible period by the time the ineligibility is established. This is so because eligibility is determined by reference to the preceding year's earnings. These must first be determined; the Board must then provide necessary procedural safeguards before the annuity can be terminated; and, even after the Board has properly reached its determination of ineligibility, the annuitant receives a forty-five day grace period under § 4–620(a)(1)(C) before the payments are actually cut off.

■ The Act does not expressly indicate whether the Board may offset against reestablished annuity payments the amount received by the annuitant during this combined period of temporary ineligibility. One provision, § 4–627(c), obliquely touches upon the issue:

> Except in a case of fraud against the District of Columbia, the [Board] may waive collection of any amount less than $100 which was paid to an annuitant in excess of the amount to which such annuitant was entitled under §§ 4–607 to 4–630.

The Board's statutory power to waive collection of certain sums implies that the Board, in cases where a waiver is not appropriate, may bring a civil action to recover annuity overpayments. This implied power lends some support to the view that the Board has a related power to offset

---

**14.** The retirement statute, although permitting reestablishment, does not indicate the precise date upon which an annuitant becomes eligible for reestablishment. As we note in the text, however, the legislature did not intend to attach a penalty to a temporary period of ineligibility. Any statutory construction which tied punitive consequences to temporary ineligibility would therefore defy the legislative intent by deterring annuitants from fully developing their earning capacities. *Roberts, supra* note 1, 412 A.2d at 51. Accordingly, as petitioner's earnings exceeded the 80% income limit for one year only, it follows that he should lose benefits for one year only. For purposes of computing the backdated annuity payments, we hold that petitioner's eligibility for reestablishment began on January 1, 1982, the first date of the year following that in which his income fell back below the 80% limit. Petitioner was not in a position to apply for retroactive reestablishment, of course, until sometime after this date of eligibility had passed.

against a reestablished annuity any payments received during the period for which the annuitant was not eligible. But the Board's implied power of recoupment by way of civil proceedings does not conclusively resolve the matter, because it can also be argued that the implied civil action restricts the Board to that device, and that the Board is precluded from achieving the same end by offsetting overpayments.

There are other reasons, however, supporting the Board's view that it has power to offset overpayments received by the annuitant prior to reestablishment. As we have noted, § 4–627(c) implies a power in the Board to recover by way of civil proceedings in all cases of overpayment, irrespective of whether or not the annuitant has been found guilty of fraud. Construing the statute to permit the Board also to recoup by way of offset of the amount due against the reestablished annuity promotes the obvious purpose of § 4–627(c), which is to conserve the retirement fund for those who are within the statutory eligibility requirements. Our construction does not deprive the reestablished annuitant of the right to judicial scrutiny of the Board's action, because he or she had the right to petition this court for review of the ineligibility decision at the time it was made. Allowing the Board to offset overpayments against the reestablished annuity preserves both agency resources and those of the Superior Court from unnecessary civil proceedings. It furthers the goal of judicial economy in the additional sense that we are not called upon to review the same issue twice. Accepting as reasonable the Board's construction of the retirement statute, we hold that it may offset against petitioner's retroactively reestablished annuity the payments received by him during calendar year 1981, the ineligible period during the year immediately following that in which his earnings exceeded the 80% income limit.[15]

In calculating any offset, the Board must afford petitioner the opportunity to present his views on any amount in dispute before the final determination is made. Furthermore, our conclusion that the Board may offset overpayments against a reestablished annuity extends only to overpaid sums which were the subject of the Board's prior ineligibility determination and with respect to which the annuitant has already had the opportunity to seek review in this court. The Board's power to offset overpayments does not reach any sums to which the Board deems the reestablished annuitant was not entitled, but with regard to which ineligibility has not been determined in a prior administrative proceeding. Where the Board claims overpayment of these latter amounts, even where the annuity has since been reestablished, it may recover the overpayments only by way of a civil action in the manner implied in § 4–627(c). We need not consider in the present case whether there may be situations where the Board would not be empowered to offset overpayments against a reestablished annuity because to do so would defeat the humane purposes of the retirement statute.

*Conclusion*

We hold (1) that the Board's finding was not supported by substantial evidence, and that the Board failed to abide by the requirements of due process, when it withheld reestablishment of petitioner's annuity on the ground that he had willfully failed to comply with the requirements of § 4–620(c)(5); (2) that petitioner was entitled to reestablishment of his disability annuity retroactive to January 1, 1982, the first date of the year following that in which his income fell back below the 80% eligibility limit after a period of temporary ineligibility; and (3) that the Board is empowered to offset against the amount due to petitioner the payments he received during calendar

15. The Board may also offset the payments already received by petitioner during the few days between January 1, 1982, the date on which he became eligible for reestablishment, and January 4, 1982, the date on which his annuity was actually revoked.

year 1981, the year following that in which his income was above the 80% eligibility limit, and before his ineligibility had been established and benefits revoked. We reverse and remand for further proceedings consistent with this opinion.

*So ordered.*

### APPENDIX

*Prior to December 31, 1980*

Petitioner Thomas Ridge was in receipt of the disability annuity for which he was eligible.

*Calendar year 1981*

Petitioner was temporarily ineligible for disability annuity because his income from self-employment for calendar year 1980 had risen above the statutory limit of 80% of the current rate of pay in the position petitioner held immediately before his retirement from the Metropolitan Police Department ("MPD"); because his ineligibility was not established until later, however, petitioner continued to receive benefits during 1981.

*January 1, 1982*

Because petitioner's 1981 earnings had fallen back below the 80% limit, he became eligible for reestablishment of his disability annuity, which was about to be cut off by the Police and Firefighters Retirement and Relief Board ("the Board") due to his ineligibility for 1981.

*January 4, 1982*

The Board, having determined after a hearing that petitioner's earnings for 1980 were above the 80% limit, and that he was therefore ineligible for calendar year 1981, revoked petitioner's disability annuity.

*April 9, 1982*

In the absence of either statutory or agency guidelines on how to proceed, petitioner made a formal request, based on his 1981 earnings, for reestablishment of his disability annuity; he attached his 1981 Internal

Revenue Service ("IRS") Form 1040, Schedule C, Profit or (Loss) from Business or Profession; petitioner offered to furnish further information as required, and asked for expedited consideration of his application.

*April 14, 1982*

The Board acknowledged receipt of petitioner's request for reestablishment; it forwarded the documents to the Internal Affairs Division ("IAD") of the MPD for evaluation, and informed petitioner that no final action would be taken without IRS verification of his income.

*April 22, 1982*

Petitioner received a request from the Board to submit a notarized 1981 "Disability Retiree Employment Questionnaire and Report of Income," which was to be returned within thirty days.

*May 11, 1982*

Petitioner filed the notarized statement required by the Board; he also submitted his authorization for disclosure of information, so that the Board could verify his income information with the IRS.

*May 18, 1982*

The Board acknowledged receipt of these documents and undertook to forward them "to the appropriate officials for necessary action."

*September 16, 1982*

The IAD requested that petitioner provide additional information—a complete copy of the 1981 joint tax return which petitioner had filed with his wife.

*October 7, 1982*

Petitioner initially refused the IAD's request on the ground that the retirement statute requires reestablishment of the annuity based on an assessment of the annuitant's income only, which information he

had already provided, and that any consideration of his wife's income was therefore irrelevant.

*October 25, 1982*

Petitioner relented; he and his wife granted access to their 1981 joint tax return and enclosed another income disclosure authorization so that the Board could verify any necessary information with the IRS.

*February 4, 1983*

Petitioner inquired into the delay in processing his application for reestablishment of his disability annuity.

*February 22, 1983*

The Board acknowledged receipt of petitioner's inquiry into the delay; the Board then informed petitioner that it was in possession of an IAD report dated August 9, 1982, which indicated the gross and net income of his business as contained in the 1981 Schedule C which he had submitted on April 9, 1982; the Board also informed petitioner, for the first time, that it could not make a determination as to whether he was in fact below the income limit until it had access to "the supporting tax reporting information used by [petitioner] to arrive at the income figures reported by him."

*March 11, 1983*

Petitioner forwarded the Board a copy of his 1981 joint tax return and all accompanying schedules.

*April 4, 1983*

The Board indicated that its initial examination of the 1981 joint tax return posed several questions; it suggested that further examination might "result in the need for both answers and additional information in order for the Board to consider passing upon [petitioner's] application for reestablishment to retirement annuity."

*May 9, 1983*

The Board informed petitioner that it was in possession of an IAD report which indicated that he was still above the 80% statutory income limit; it notified petitioner, for the first time, that he could request a hearing regarding his eligibility for reestablishment to his disability annuity.

*May 17, 1983*

Petitioner stated that he would determine whether a hearing was in order when he received a copy of the unseen IAD report mentioned in the Board's letter of May 9, 1983, together with a statement of the facts and rationale behind the Board's decision that he was still above the 80% income limit; if this information was not forthcoming, he requested a hearing anyway.

*June 10, 1983*

The Board sent petitioner a copy of the IAD report he requested, together with another adverse internal report; both of these documents relied on the "gross receipts or sales" of petitioner's service station as reported in his 1981 Schedule C, which were above the 80% income limit, although its "net profits" were below that figure; the Board informed petitioner that it could not provide a rationale for a decision that he was above the 80% limit, since no decision had been made; it stated, for the first time, that a decision could not "be made until a hearing is held on the evidence of record and, possibly, additional information is received."

*June 22, 1983*

Petitioner, describing himself as "perplexed at the Board's actions of the last several months," requested through counsel a conclusive written statement of the Board's position concerning his reestablishment request: "If you are of the opinion that [petitioner] is still restored to an earning capacity I wish a written document to that effect so that I may perfect my appeal. If it is your position that no decision on [petitioner's] status can be made until

and unless a hearing is held, I request that your office contact me immediately to arrange a suitable date for such a hearing."

*July 1, 1983*

The Board informed petitioner that a hearing on his reestablishment application was scheduled for August 4, 1983; in preparation for the hearing, the Board required copies of petitioner's 1981 tax returns and supporting documents and, for the first time, copies of his 1982 tax returns and all supporting documents; the Board also requested, for the first time, "[c]opies of the accounting books of the Exxon business and records, including the salary and expense ledgers, for 1981 and 1982"; these documents were to be submitted before July 20, 1983.

*July 25, 1983*

Petitioner informed the Board that he could not possibly comply with its request for numerous documents without closing his business; he described its request as "unduly burdensome and broad in scope," but stated his intention to provide ample documentation at the hearing.

*July 27, 1983*

Petitioner, on the advice of his Certified Public Accountant ("CPA"), requested a postponement of between thirty and sixty days to enable the CPA to complete his audit of approximately 6 cu. ft. of records required by the Board.

*August 4, 1983*

The Board granted a postponement of the hearing until September 15, 1983.

*September 15, 1983*

The hearing on petitioner's request for establishment of his discontinued disability annuity was finally held and petitioner presented testimony on his behalf.

*September 19, 1983*

Petitioner submitted further documentation for 1980, 1981 and 1982, which he had received from his tax preparer; the Board had kept the record open for this purpose.

*September 22, 1983*

The Board, having considered evidence of petitioner's income for calendar years 1981 and 1982, concluded that he was in compliance with the statutory 80% income limit for both of those years.

*September 28, 1983*

Petitioner, unaware of the Board's decision, requested an expedited decision due to his "poor financial shape."

*October 4, 1983*

The Board ordered that petitioner's disability annuity be reestablished effective September 22, 1983, the date of its decision.

*October 20, 1983*

In *Ridge I*, petitioner sought review in this court of the Board's decision; he argued that his annuity should have been reestablished retroactive to the date on which he became eligible for reestablishment on the basis of his 1981 earnings.

*December 2, 1983*

The Board, never having considered the possibility of backdating the annuity payments to the date of eligibility, requested a remand of *Ridge I* in order to make findings and conclusions on that and other issues.

*January 27, 1984*

This court initially denied the Board's motion for a remand.

*July 16, 1984*

This court ordered supplemental briefing from the parties as to whether temporarily discontinued annuity benefits must be retroactively reestablished and as to wheth-

er the Board has power to offset from the amount due the payments made during the period when the annuitant was ineligible.

*January 4, 1985*

This court, having reconsidered the Board's request, remanded *Ridge I* for the Board to determine the appropriate date for reestablishment of petitioner's disability annuity; we also suggested—in order that annuitants be put on notice of the applicable rules and that future cases be decided appropriately—that the Board adopt regulations concerning both this issue and whether the [Board] had authority to offset the annuity payments inevitably made during the ineligible period.

*April 10, 1985*

On remand from *Ridge I*, the Board affirmed its previous decision to reestablish the annuity effective September 22, 1983, the date on which that decision was made rather than the earlier date on which petitioner actually became eligible for reestablishment; the Board found, without the allegation ever having been made during three years of proceedings on unrelated issues, that petitioner had willfully failed to timely file required information and, pursuant to § 4–620(c)(5), had thus forfeited his annuity for the period up to its original reestablishment decision dated September 22, 1983; the Board ordered again that petitioner's disability annuity be reestablished from that date only.

*April 29, 1985*

Petitioner sought review in this court of the Board's decision dated April 10, 1985; he argued, for the second time, that his disability annuity should have been reestablished from the date on which he became eligible for reestablishment, based on his 1981 earnings, rather than the considerably later date on which the Board finally rendered its original reestablishment order.